UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SMART SCIENCE LABORATORIES, INC,
a Florida Corporation,

     Plaintiff

                                     CASE NO.

v.

PROMOTIONAL MARKETING SERVICES, INC.
a New York corporation, JASON KRONISH, ANN
GLASSMAN, ADRIANNE MILLMAN,
QUALITY KING DISTRIBUTORS INC, a New
York corporation, CARDINAL HEALTH, INC, an
Ohio corporation, MCKESSON CORP., a Delaware
Corporation, and AMERISOURCEBERGEN CORP.,
And JOHN DOES NOS. 1-30 And John Does Presidents
And JOHN DOES NOS. 1-10, Drug Store Retailers

     Defendants.

_____/

## COMPLAINT FOR MONETARY DAMAGES (BREACH OF CONTRACT, FRAUD, NEGLIGENT MISREPRESENTATION, VIOLATIONS OF FEDERAL AND FLORIDA RICO STATUTES, DECEPTIVE AND UNFAIR TRADE PRACTICES)

### (JURY TRIAL DEMANDED)

Plaintiff, SMART SCIENCE LABORATORIES, INC. (hereinafter "SMART

SCIENCE"), a Florida corporation, by and through its undersigned attorney; hereby sues

Defendants, PROMOTIONAL MARKETING SERVICES, INC. , a New York

corporation,NATIONWIDEBRANDS.COM  (hereafter "PMSI-NATIONWIDE", and

Quality King Distributors Inc, Cardinal Health Inc. (Cardinal), McKesson Corp.

(McKesson), AmerisourceBergen Corp, and JOHN DOES NOS. 1 through 30, for

breach of contract, fraud, negligent misrepresentation, violations of Federal and Florida

RICO statutes.  In support of its Complaint for Monetary Damages, Plaintiff states as

follows:

INTRODUCTION and BACKGROUND
The OTC Drug Distribution System in the United States

1.      In the United States Over-the Counter (OTC) non-prescription drug

manufacturers use a multi-tier system of direct sales to major retailers and wholesalers to

distribute their drugs to retailers for sale to consumers.  Retailers include: major drug store

chains, e.g. Walgreens, CVS, Rite Aid; small pharmacies (sometimes referred to as

community pharmacies; mass merchandisers, e.g. Wal-Mart, Target, K-mart; and food

chains, e.g. Ralph's, Albertsons, Giant, Grand Union.

2.      This is different from prescription drugs which are dominantly sold to

retail pharmacies (chain and community) by drug wholesalers.  In the OTC arena drug

wholesalers buy from manufacturers to sell and distribute to the smaller retailers.  The

three major drug wholesalers are McKesson, Cardinal, and AmerisourceBergen.  There

are also some smaller regional wholesalers who also buy and distribute to small retailers,

and hospitals, clinics, doctors.

3.      In order to get new products introduced into the retail trade manufacturers,

especially new smaller manufacturers must persuade drug retailers, especially the large

pharmacy chain stores, and mass marketers, to add their product and provide shelf space.

To get these customers to agree manufacturers pay slotting fees, give initial discounts or

supply free product, take 90 day terms, and commit to advertising including TV and print

to assure that product will "move off the shelf."  The advertising commitment may

2

include buying ads in retailer Sunday newspaper supplements.  In effect the process is like renting space for a store based upon sales.  If the product sales collapse the retailer will discontinue purchasing the goods.

4.     Advertising and promotion serve to acquaint the consumer with the existence of the product and its benefits.  Advertising drives retailer sales and the commitment to advertise and promote is the principal incentive for retailers to take on new products.

5.     In setting the "list" or selling price an OTC drug manufacturer will establish a sales price that considers overhead, cost of goods, advertising and promotion costs, and other sales costs. Retailers will then mark up the price anywhere from 30% to 100% for sale to consumers.

6.     An OTC drug manufacturer will also discount the price of a particular drug as a way to increase a drug's market share and provide the drug to non-competing markets inside and outside the United States. For example, if the U.S. sales are successful the drug manufacturer will be contacted by companies to sell a drug in a foreign country. They will be asked to offer a price discount to those buyers who will assume all marketing costs, a major cost the manufacturer will not bear overseas. Thus there is a promise of expanding existing U.S. retailer sales at very low cost.

7.     In addition drug manufactures may be approached by companies that offer to undertake special marketing promotions that will place products into consumer hands directly at substantial one-time discounts to sample the product.  If the consumer likes it he must then buy it at retail.  Of course the promoter asks for a big discount since it is he that will advertise in national Sunday supplements and the internet and bear all marketing, advertising and distribution costs. These companies then sell the drug into the "secondary

3

wholesale market."

8.     The "secondary" wholesale market place is where the party does not buy a product directly from the manufacturers but from the initial larcenist or a chain of successors up the line to retailers. This practice of buying and selling OTC drugs in this market is not *per se* illegal. However, the fact that a particular type of drug can now be bought for multiple prices creates an opportunity for unscrupulous "wholesalers" and retailers to exploit this (so called diversion or gray) market by resorting to and consciously benefiting from the initial fraud and misrepresentation on the manufacturer. These intermediaries and retailers take advantage of these "front" organizations to reap ill gotten profits. As will be discussed below these purchasers know or have reason to know the goods were obtained through larceny. Further goods bought at a discount by the conspiring retailer are not discounted to the consumer but added to the retailer's bottom line.

9.     For example, the front will claim that the drugs purchased at a discount will be sold in a foreign market that is not being exploited by the manufacturer and not resold into the U.S. market (to the regular retail market) or the drugs obtained at a discount price will only be sold one time directly to U.S. consumers also at a discount. Instead, they are sold into the United States market.

10.     Knowledge of the fraud may be shown or imputed to the buyers based upon their participation in the fraud, directing a wholesaler to get the product for less than they are buying it for directly from the manufacturer, or based upon the condition of the goods at the time of purchase. In this instance, a secondary wholesaler or even the big three wholesalers and "legitimate" retailers will buy the same goods that they are buying directly from the manufacturer only if they are in perfect condition (i.e. brand new with

4

full expiration date, proper UPC codes, undamaged, and not short dated or close to or over their expiration date) at a lower than normal price they are concurrently paying to the manufacturer in order to knowingly get goods for the illegitimate lower price that is being offered for sale by the secondary wholesaler. All this is conclusive evidence that the buyer is not a good faith purchaser for value. Thus even our so called legitimate wholesalers and chain drug stores turn a blind eye to the corrupt or illegal practices of a supplier to make a profit at the expense of the manufacturer who invested in product development, advertising and promotion (even at the behest of the retailers) only to see its margin stolen rather than reinvested in expansion of its product's retailer sales.

11.    As a consequence the manufacturer loses his gross profit margin (the difference between the discount price, e.g. $4.00 and price paid by retailers, e.g. $11.00, in this example $7.00 per unit). This represents a substantial loss of cash flow that the manufacturer needs to cover his marketing, advertising and promotion costs necessary to support retail sales. The "secondary wholesaler(s)" pocket the difference between their cost of goods and the price they get from the next wholesaler or retailer. The retailer gets a discount below the price they regularly pay the manufacturer directly. As a consequence of this the manufacturer's sales spiral down when he no longer is able to advertise and promote his product to drive retail sales. Further the loss of sales diminishes the value of a company, especially new small start-up companies with limited capital.

12.    Companies and products are targeted by the fronts by design. They used to be large companies whose foreign sales group needs to meet a sales quota. However, these large companies now have controls to prevent

"internal" fraud and collusion with the fronts. The most recent target has been small unsophisticated OTC drug companies that have new innovative products that are quickly gaining substantial sales. These companies product can be readily identified from published sales and marketing data. Because of their volume of sales the products can be easily sold in the secondary markets.

13.     This secondary wholesale market also provides unscrupulous wholesalers with a gateway to introduce counterfeit and stolen drugs into the drug distribution system. We have now seen this with fake Head and Shoulders® shampoo and Colgate tooth paste (which contained the poison, ethylene glycol). These secondary wholesalers who have reaped great profits from their fraud and now have reped illegal profits so they can counterfeit goods instead of having to defraud legitimate companies. In either case they sell the goods "on the back" of the advertising and promotion costs of the legitimate manufacturers, and again reap the profits.

14.     As we will show below all the defendants are perpetrators of fraud or conscious beneficiaries, whether secondary wholesalers, the big three wholesalers, and retailers that knew or had reason to know that the goods they purchased were obtained by fraud. Why else would any manufacturer create competition (a secondary source) to his own product's direct sales to retailers and destroy his own company.

15.     This action is for, *inter alia,* breach of contract, fraud, negligent misrepresentation, and violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *at seq,* the Florida RICO Statute, *Fla. Stat. § 895.01 et seq,* and the Florida Civil Remedies For Criminal Practices Act, *Fla. Stat. § 772.101, at seq.*

16.     As alleged herein, Defendant PMSI-NATIONWIDE, is engaged in the

6

widespread criminal practice of procuring large numbers of consumer products from manufacturers (such as Plaintiff) at substantial discounts as part of a "sample" promotion after giving false assurances that such products will not be resold to retailers. Upon obtaining such products under false and fraudulent pretenses, Defendant PMSI-NATIONWIDE, illegally sells these products to wholesalers and other product diverters who then resell the diverted products at prices that greatly undercut the manufacturer's normal wholesale selling price to the retail trade that is normally serviced by such manufacturers.

17. As a result of the alleged tortious and other unlawful acts described below, Plaintiff has suffered devastating financial losses, lost business opportunities, lost good will and credibility with investors, and suffered other harm to its burgeoning business.

PARTIES

18. Plaintiff SMART SCIENCE is a Florida corporation with its principal place of business in Odessa, Florida. Plaintiff is engaged generally in the business of manufacturing, packaging, selling and distributing over-the-counter pharmaceuticals and cosmetic products.

19. Defendant PMSI-NATIONWIDE has its principal place of business at Chestnut Ridge, New York. Defendant PMSI-NATIONWIDE, is engaged generally in the business of promoting itself as an assembler of groups of products which they sell to consumers responding to advertising in leading print media, magazines and newspaper supplements, as product "samples" at discount prices. Instead it purchases the products for sale in the secondary market in contravention of its agreements and representations to manufacturers.

20. Defendants John Does Nos. 1 through 10 are those wholesalers and

7

retailers, whose identities have not yet been ascertained, which have purchased, and are believed to still be purchasing Plaintiff's pharmaceutical products from Defendant PMSI-NATIONWIDE, at unauthorized prices.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332, as there exists complete diversity between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, costs, attorneys' fees, treble damages, and/or punitive damages. Plaintiff is a citizen of the State of Florida, while Defendants are citizens of other states. This Court also has federal question subject matter jurisdiction over this matter pursuant to the provisions of 18 U.S.C. §1964(c) and 28 U.S.C. § 1331, since Plaintiff has alleged violations of the federal RICO statute, 18 U.S.C. § 1961 et seq. This Court has pendant jurisdiction over the Florida state law claims under Chapter 772 and Chapter 895 of the Florida Statutes.

22.     This Court has *in personam* jurisdiction over the Defendants since each of them has committed tortious acts, or is a joint tortfeaor, against the Plaintiff in Florida, causing injury to Plaintiff in Florida. Defendant PMSI-NATIONWIDE, also engaged in multiple similar business transactions with Plaintiff and others in Florida and interstate commerce. These transactions have included negotiating and entering into a business and contractual relationship with Plaintiff, and submitting purchase orders to Plaintiff in Florida. Defendant PMSI-NATIONWIDE also conducted substantial business with Plaintiff in Florida by telephone, facsimile and mail. As a result of these contacts, Defendant PMSI-NATIONWIDE, engaged in substantial and not isolated activity in Florida; has availed itself of the benefits of Florida law; has thereafter committed one or

more tortious acts in this state, breached a contract in this state, and is, therefore, subject to personal Florida law. Venue is proper in this district pursuant to 28 U.S.C. §1391.

23.     Plaintiff demands a trial by jury on each and every one of its claims.

24.     All conditions precedent to the initiation and maintenance of this action have been performed or have occurred.

## FACTS COMMON TO ALL COUNTS

25.     Plaintiff SMART SCIENCE is a manufacturer, developer and marketer of "over-the-counter" topical drug preparations and cosmetics. Plaintiff has been in business for about nine years. Plaintiff competes against major manufacturers such as Pfizer (Ben Gay), Chattem (Icy-Hot), as well as products of other major manufacturers such as Mentholatum, Absorbine Junior, and others. One of SMART SCIENCE's most successful products is JointFlex Pain Relieving Cream ("JointFlex"), an arthritis pain relieving cream.

26.     Plaintiff SMART SCIENCE has made a significant investment in its "JointFlex" pain relieving cream. Within the past nine years, through costly, direct to consumer advertising, and subsequent retail support advertising, Plaintiff's product, "Jointflex" cream, by June 2003, became the fifth highest-selling topical analgesic product in the United States, according to independent statistics published by IRI Marketing Services ("IRI").

27.     Until its transactions with Defendant PMSI-NATIONWIDE, Plaintiff SMART SCIENCE was about to achieve its first profitable year.

28.     Due to the criminal, racketeering and tortious acts of fraud, and violations of the predicate statutes enumerated below, and Plaintiff's reasonable reliance upon the

misrepresentations and plan of deceit of Defendant PMSI-NATIONWIDE. Plaintiff has proximately suffered injury including financial harm, loss of business opportunities, the need to borrow funds to replace cash flow, loss of good will and credibility with investors, and other harm to its burgeoning successful business, causing it to become unprofitable.

29.     Defendant PMSI-NATIONWIDE has been operated as a criminal and racketeering enterprise continuously for several years. It continues to engage in its illicit pattern of activity.

30.     Defendant PMSI-NATIONWIDE, promotes itself as being engaged generally in the business of assembling groups of products and selling them to consumers responding to advertising, in leading print media, Sunday supplements and magazines as product "Samples" at a discount price. Consumers can apply only once. Then, being no longer qualified to obtain the "sample," the consumer must procure the product at retail. In fact, Defendant PMSI-NATIONWIDE, systematically sells the product so procured (in this case almost immediately) to wholesalers, product diverters, and others who then resell the product at prices that undercut the manufacturer's normal price to the retail trade (national chain drug store, supermarkets, and discount stores) normally serviced directly by Plaintiff SMART SCIENCE and other manufacturers.

31.     In early February 2003, Plaintiff SMART SCIENCE received a solicitation in Florida, via regular United States mail, dated February 3, 2003, from Defendant PMSI-NATIONWIDE. The solicitation was sent by Mr. Jason Kronish, Group Product Manager, PMSI-NATIONWIDE, and was addressed to Mr. Gene C. Weitz, President of Plaintiff SMART SCIENCE. The premise behind the solicitation was that Defendant PMSI-NATIONWIDE, was engaged in the practice of purchasing full-size

branded products from manufacturers at a vast discount, and then would bundle and resell these products as a package to retail consumers over the Internet at a significant discount from the full retail price of the products. The idea was that the retail customer would then develop an affinity for the product and would subsequently become a regular retail customer of the product through normal retail channels, at normal retail prices.

32.     On March 31, 2003, Mr. Kronish sent a follow-up solicitation to Mr. Weitz. This solicitation was virtually identical to the original solicitation.

33.     This solicitation contained a description of the services provided by Defendant PMSI-NATIONWIDE, which stated that Defendant would utilize direct mail marketing and internet marketing to promote the sales of the products of Plaintiff SMART SCIENCE.  Subsequently, Mr. Weitz and Mr. Kronish had a telephone conversation with respect to the March 31, 2003, solicitation. As a result of this conversation, on April 15, 2003, Plaintiff SMART SCIENCE, by and through Mr. Jason Kronish, sent Defendant PMSI-NATIONWIDE, a sample of its full-size (4 ounce) tube and sample-size tube of its JointFlex Pain Relieving Cream ("JointFlex"), together with some promotional literature. After further discussion, Defendant PMSI-NATIONWIDE, informed Plaintiff SMART SCIENCE that it wanted to include "Jointflex" in its multi-product promotion "package" of consumer goods that it offered directly to consumers through an Internet web site. The ostensible purpose of the marketing plan of Defendant PMSI-NATIONWIDE was to introduce consumers to "Jointflex" so that they would try it, and then purchase it at retail.

34.     As a result, on or about May 19, 2003, Plaintiff SMART SCIENCE, by and through its President and Chief Executive Officer, Mr. Gene C. Weitz, and Defendant PMSI-NATIONWIDE, by and through its Vice President of Marketing, Ms.

Anne Glassman, entered into an Agreement under which the 4 ounce, regular size, "Jointflex" product would be placed in the "Create Your Own" promotion package offered by Defendant. While the suggested retail price for the product was $18.98 per unit, and the normal wholesale price was $9.95 per unit, the agreement called for a unit price of $3.50 per unit, a discount of $6.45 per unit. The contract called for the purchase by Defendant from Plaintiff of up to 50,000 units, resulting in a discount of $322,500.00. Paragraph 10 of the Agreement specifically stated that "Buyer agrees that this product will only be distributed through Nationwidebrands.com web site via our Sampling Promotional Packages. Buyer agrees not to sell or distribute the above product directly to the retail market." Also on May 19, 2003, Defendant PMSI-NATIONWIDE, sent to Plaintiff SMART SCIENCE a Purchase Order, requesting 7,056 four ounce tubes of "JointFlex". This purchase order was fulfilled. On June 10, 2003, Defendant PMSI-NATIONWIDE, sent to Plaintiff SMART SCIENCE a Purchase Order, requesting 6,744 four ounce tubes of "JointFlex". This purchase order was fulfilled. On July 16, 2003, Defendant PMSI-NATIONWIDE, sent to Plaintiff SMART SCIENCE a Purchase Order, requesting 6,000 four ounce tubes of "JointFlex". This purchase order was fulfilled.

35.    On August 13, 2003, Defendant PMSI-NATIONWIDE,  sent to Plaintiff SMART SCIENCE a Purchase Order, requesting 6,000 four ounce tubes of "JointFlex". This purchase order was fulfilled.

36.    On September 9, 2003, Defendant PMSI-NATIONWIDE, sent to Plaintiff SMART SCIENCE a Purchase Order, requesting 10,800 four ounce tubes of "JointFlex". This purchase order was never fulfilled, as Plaintiff SMART SCIENCE had noticed a significant drop-off in its regular retail sales volume, causing it to become suspicious of a possible issue regarding product diversion. Plaintiff SMART SCIENCE ceased shipping

product to Defendant PMSI-NATIONWIDE, after August 2003. Between May 2003 and August 2003, Defendant PMSI-NATIONWIDE, received 25,800 four ounce tubes of "Jointflex" from SMART SCIENCE, for sale to consumers over the Internet. Defendant PMSI-NATIONWIDE, paid a price of $3.50 per tube, which was considerably less than SMART SCIENCE's normal wholesale price of $9.95 per tube. Plaintiff SMART SCIENCE shipped the "Jointflex" tubes in interstate commerce. During the months of July 2003 through November 2003, Plaintiff SMART SCIENCE noticed a decline in "Jointflex" sales orders from its regular retail customers while, at the same time, it was receiving reports from IRI Marketing Services showing no decline in retail sales of "Jointflex".

37.    In February 2004, Plaintiff SMART SCIENCE contacted Defendant PMSI-NATIONWIDE, and requested a report that had previously been promised, specifically a survey concerning the marketing of the "JointFlex" product. Defendant's response was that the report had not been prepared because Plaintiff SMART SCIENCE had "pulled out of the program for no apparent reason". On May 3, 2004, Plaintiff SMART SCIENCE contacted Defendant PMSI-NATIONWIDE, in writing, asking for an immediate accounting of the sales and customers of the "JointFlex" four ounce product. The letter also raised the specter of product diversion to the retail market and demanded payment of any funds received by Defendant as a result of any unlawful diversion. By letter dated May 4, 2004, Defendant PMSI-NATIONWIDE, by and through Ms. Adrianne Millman, President, denied the demand of Plaintiff SMART SCIENCE for compensation and denied the commission of any unlawful diversion.

COUNT I
(BREACH OF CONTRACT)

38.     Plaintiff SMART SCIENCE realleges and incorporates herein Paragraphs 1 through 37 of this Complaint for Monetary Damages as if fully set forth herein.

39.     As an inducement to obtain Plaintiff's business, Defendant PMSI-NATIONWIDE, by and through its representatives, assured Plaintiff SMART SCIENCE and that Defendant PMSI-NATIONWIDE, would sell "JointFlex" only to consumers responding to certain advertisements and that the product would not be and was not diverted. Plaintiff relied on these assurances as a condition to its agreement to sell to Defendant PMSI-NATIONWIDE.

40.     Defendant PMSI-NATIONWIDE, failed to perform its agreement in that "JointFlex" lots sold to Defendant PMSI-NATIONWIDE, have been and are being diverted by Defendant PMSI-NATIONWIDE, and sold directly to retail outlets, in derogation of the agreement between the parties.

41.     As a direct and proximate result of the breach of contract by Defendant PMSI-NATIONWIDE, Plaintiff SMART SCIENCE has sustained and will continue to sustain damages in an amount in excess of for $25,000,000 in compensatory damages, $5,000,000 in punitive damages, or Treble damages and attorney fees, costs of this action and any other relief this Honorable Court deems just and proper, including direct loss of profits and corporate value due to the diversion, as well as substantial consequential damages. Plaintiff SMART SCIENCE has demanded immediate payment from Defendant PMSI-NATIONWIDE, for its breach of contract. Defendant PMSI-NATIONWIDE has refused to pay the damages due and owing to Plaintiff as a result of this breach of contract and tort. WHEREFORE, Plaintiff demands judgment against

14

Defendant PMSI-NATIONWIDE.

## COUNT II
## (FRAUD IN THE INDUCEMENT)

42.     Plaintiff SMART SCIENCE realleges and incorporates herein Paragraphs 1 through 32 of this Complaint for Monetary Damages as if fully set forth herein. When Defendant PMSI-NATIONWIDE, by and through its agents and representatives, specifically represented to Plaintiff SMART SCIENCE that Defendant PMSI-NATIONWIDE, would not divert Plaintiff's products and it intended for Plaintiff SMART SCIENCE to rely upon such representations as an inducement to enter into business relations with Defendant PMSI-NATIONWIDE.

43.     Defendant PMSI-NATIONWIDE, also supplied false and misleading information as to their compliance with the written and verbal agreement to Plaintiff as an inducement to convince Plaintiff to allow Defendant PMSI-NATIONWIDE, to buy, and continue to buy, the SMART SCIENCE "Jointflex" product. The representations of Defendant PMSI-NATIONWIDE, regarding its intentions to prevent diversion of SMART SCIENCE's products to retail outlets and compliance therewith were false. Defendant PMSI-NATIONWIDE, knew that such representations were false when made or that such statements were made without knowledge of the truth or falsity of those statements. The representations of Defendant PMSI-NATIONWIDE, to Plaintiff were material to Plaintiff's decision to enter into the agreement to allow Defendant PMSI-NATIONWIDE, to sell its "JointFlex" product. Plaintiff SMART SCIENCE reasonably relied upon the false representations of Defendant PMSI-NATIONWIDE, in agreeing to allow Defendant PMSI-NATIONWIDE, to sell the "JointFlex" product.

15

44. As a direct and proximate result of these misrepresentations of material fact, Plaintiff SMART SCIENCE has sustained and will continue to sustain substantial damages by virtue of the fact that it was unable to sell its "JointFlex" product to retail outlets at its normal wholesale price by virtue of its being improperly undercut by Defendant PMSI-NATIONWIDE, in this unlawful diversion scheme.

45. The above-described conduct of Defendant PMSI-NATIONWIDE was the result of its economically driven evil motive or reckless indifference to the rights of Plaintiff, thereby warranting the imposition of punitive damages. Plaintiff is entitled to punitive damages on this count. WHEREFORE, Plaintiff demands judgment against Defendants for $25,000,000 in compensatory damages, $5,000,000 in punitive damages, or Treble damages and attorney fees, costs of this action and any other relief this Honorable Court deems just and proper.

COUNT III
(NEGLIGENT MISREPRESENTATION)

46. Plaintiff SMART SCIENCE realleges and incorporates herein Paragraphs 1 through 37 of this Complaint for Monetary Damages as if fully set forth herein.

47. Defendant PMSI-NATIONWIDE, made misrepresentations of material fact to Plaintiff SMART SCIENCE regarding its intentions to sell Plaintiff's "JointFlex" product and failed to disclose their true intentions to divert Plaintiff's "JointFlex" product to retail establishments at a substantially reduced wholesale price.

48. Defendant PMSI-NATIONWIDE, also supplied false and misleading information as to Defendant PMSI-Nationwide's, compliance with the written and verbal agreement to Plaintiff as an inducement to convince Plaintiff to allow Defendant PMSI-NATIONWIDE, to buy, and continue to buy, the SMART SCIENCE "Jointflex" product.

16

49.     Defendant PMSI-NATIONWIDE, failed to exercise reasonable care or competence in obtaining or communicating complete and accurate information to Plaintiff SMART SCIENCE in the course of its business transactions with Plaintiff SMART SCIENCE, including the failure to inform Plaintiff SMART SCIENCE that Defendant PMSI-NATIONWIDE, had previously engaged in a similar diversion scheme with other companies.

50.     Plaintiff SMART SCIENCE justifiably relied upon the misrepresentations of material fact that were made by Defendant PMSI-NATIONWIDE, and as a result of such reliance, Plaintiff has sustained substantial damages. Plaintiff is entitled to punitive damages on this count. WHEREFORE, Plaintiff demands judgment against Defendants for $25,000,000 in compensatory damages, $5,000,000 in punitive damages, or Treble damages and attorney fees, costs of this action and any other relief this Honorable Court deems just and proper.

## COUNT IV
## A. (VIOLATIONS OF FEDERAL RICO STATUTE)
## BY PROMOTIONAL MARKETING INC, d/b/a NATIONWIDEBRANDS.COM

51.     Plaintiff SMART SCIENCE realleges and incorporates herein Paragraphs 1 through 32 of this Complaint for Monetary Damages as if fully set forth herein.

52.     In addition to the defendant NATIONWIDE wholesalers and retailers participated in other fraudulent diversion schemes though A.M. Value, Inc.

53.     This Count arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* As alleged herein, Defendant PMSI-NATIONWIDE, and its agents, associates and representatives, have conducted, and have conspired to conduct, the affairs of Defendant PMSI-NATIONWIDE, through a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962 (a), (b), (c), and (d).

Specifically, Defendant PMSI-NATIONWIDE, has received income from a pattern of racketeering activity, i.e, it is systematically engaged in the widespread practice of fraudulently procuring consumer products from manufacturers, such as Plaintiff, at substantial discounts for sale to consumers as "samples" after giving assurances that such products will not be resold to retailers. Upon obtaining such products, Defendant PMSI-NATIONWIDE, illegally sold these products through its "enterprise" to wholesalers and others who then resold the products at prices that undercut the manufacturer's normal selling price to the retail trade normally serviced by such manufacturers.

54.     The above-described actions (including multiple fraudulent misrepresentations, as detailed above) by Defendant PMSI-NATIONWIDE, represented a scheme and artifice to defraud Plaintiff SMART SCIENCE, which was facilitated by the use of the United States Mail and "wire" communications (i.e., telephone and facsimile), caused by Defendant, and resulting in the commission of mail fraud and wire fraud against Plaintiff SMART SCIENCE within the meaning of 18 U.S.C. § 1341. Both mail fraud and wire fraud constitute the requisite predicate act "racketeering activity" under 18 U.S.C. § 1961. Defendant PMSI-NATIONWIDE, is an "enterprise" within the meaning of 18 U.S.C. §1961(4), which is engaged in, or the activities of which affect, interstate commerce and into which ill-gotten profits are recycled. The primary objective of the enterprise is to divert Plaintiff's products through deceptions and misrepresentations and to inflict severe economic hardship upon Plaintiff, with the intent of depriving it of sales to its customers and risking foreseeable severe consequential damages. Defendant PMSI-NATIONWIDE has close links with several major wholesalers of products. Upon information and belief, such wholesalers (referred to above as "John Does Nos. 1 through 10"), having full knowledge of the *modus operandi*

of Defendant PMSI-NATIONWIDE, purchased "JointFlex" from Defendant PMSI-
NATIONWIDE, at vastly reduced prices and then resold those goods to the regular
customers of Plaintiff SMART SCIENCE at prices below the wholesale prices normally
charged these same customers.

55.    The actions of Defendant PMSI-NATIONWIDE, in unlawfully diverting
of Plaintiff's products and making multiple fraudulent representations, as described in
detail above, constitute a "pattern" of racketeering activity within the meaning of 28
U.S.C. § 1961(5). In addition, Plaintiff is aware and has evidence of several other
instances of similar frauds and diversion against other manufacturers by PMSI-
NATIONWIDE and other Defendants within the preceding five-year period including
Woodward Laboratories, Inc. of California, and others constituting "racketeering"
activity as alleged herein and involves the same pattern of conduct with similar results,
participants, victims, and methods of interrelated conduct. This evidence shows that the
fraudulent conduct described herein is the regular way of doing business of Defendant
PMSI-NATIONWIDE. In each case, representatives of Defendant PMSI-
NATIONWIDE, approached a particular manufacturer and offered to purchase "samples"
at a substantial discount to be sold to consumers who have never used the product. Then,
after obtaining significant numbers of the product after giving assurances that they would
not be diverted to the retail trade, Defendants did exactly the opposite of what they
represented: they begin to sell the product to wholesalers and other bulk buyers of
Plaintiff's product at prices which greatly undercut the manufacturers' normal wholesale
price. The above-described predicate acts are related to one another and pose a threat of
continuing criminal activity.

56.    As a direct and proximate result of the above-described violations,

Plaintiff SMART SCIENCE has suffered actual damages because of injury to its business.

57.     Defendant PMSI-NATIONWIDE, is liable to Plaintiff SMART SCIENCE for automatic treble damages, together with all costs of this action plus reasonable attorneys' fees, all as provided under 18 U.S.C. § 1964(c).

### (VIOLATIONS OF FEDERAL RICO STATUTE)
### BY WHOLESALERS & RETAILERS
### The Origins of the Stolen Drugs

58.     Between March 2003 and into 2004 both A.M. Value and its employees committed the exact same type of fraud on SmartScience Laboratories, as PMSI-NATIONWIDE.  On information and belief the principals of PSMI NATIONWIDE were former employees of A.M. Value and/or Frank Taubes the principal of A.M. Value.  Mr. Taubes was apparently the creator of the sampling-fraud scheme. It is in Mr. Taubes' company where the scheme was learned, copied, and practiced by principals of PMSI-NATIONWIDE.  The facts of the case against A.M. Value, including affirmation the pleading of a RICO count against A.M. Value for defrauding SmartScience in its sale of product to A.M. Value and Frank Taubes, his wife and son and other employees appears in the case record of SmartScience Labs. v. A.M. Value, Inc, et al CIVIL DOCKET FOR CASE #: 8:03-cv-02728-EAJ, before Judge Elizabeth A. Kovachevich.

### Manner In Which The Wholesalers And Retailers
### Participated In The Racketeering Enterprise

59.     On information and belief SmartScience alleges that between March 2003 and September 2004, Quality King, Inc. and John Does 1-10 wholesalers and retailers purchased JointFlex from A.M. Value (or a related company by the name of Western)

20

and PMSI-NATIONWIDE.  The goods were stolen goods obtained by larceny through

multiple instances of mail and wire fraud. The purchaser knew or had reason to know of

the larceny and therefore was not a good faith purchaser for value under Florida or any

other state law based upon the Uniform Commercial Code.  Thus no legal title passed to

Quality King or any wholesaler or other purchaser in the chain to and including retailers

for all knew or had reason to know the goods were obtained through fraud.

60.     Quality King, Inc, did receive, possess, sell and dispose of JOINTFLEX®

pain relieving cream, and cause the receipt, possession, sale, and disposition of, the stolen

property, knowing the same to have been stolen, that is, said defendants received,

possessed, sold, and disposed of, and caused the receipt, possession, sale, and disposition

of, property consisting of a quantity of the drugs which had a value of more than

$5,000.00(the trigger amount for the National Stolen property Act), which property had

crossed a State boundary after being stolen (obtained through larceny).

61.     The purchasers, wholesalers and retailers, knew or had reason to know

that the goods were obtained by theft (including larceny) and were therefore stolen goods

by virtue of their knowledge of the OTC drug industry and the demand for the product.

62.     The value of the OTC product purchased and sold in commerce exceeded

$5,000.

63.     The goods were sold to Quality King, Inc. in interstate commerce and by

Quality King, Inc, in interstate commerce to other wholesalers and retailers identified a

John Does, thus committing the RICO predicate act, that is, buy, sell, and traffic in stolen

drugs, in violation of Title 18, United States Code, Section 2315, et seq.

64.     On information and belief that Quality King and John Does  wholesalers

and retailers engaged in the buying and selling amongst  themselves of the goods stolen

21

from SmartScience, i.e. JointFlex pain relieving cream, that they knew was stolen and pocketed profits that rightfully belonged to SmartScience.

65.     It was further a part of the racketeering enterprise that its members would and did sell the stolen drugs in interstate commerce, knowing that consumers ultimately would purchase the stolen drugs without knowing or suspecting that the drugs were stolen.

66.     WHEREFORE, Plaintiff SMART SCIENCE demands judgment against Defendants, for $25,000,000 in compensatory damages, $5,000,000 in punitive damages, or Treble damages and attorney fees, costs of this action, and any other relief this Honorable Court deems just and proper.

COUNT V
(VIOLATION OF FLORIDA CRCPA AND RICO STATUTES)

67.     Plaintiff SMART SCIENCE realleges and incorporates herein Paragraphs 1 through 32 and 53 through 62 of this Complaint for Monetary Damages as if fully set forth herein. 64. The foregoing conduct constitutes a violation of the Florida Civil Remedies for Criminal Practices Act ("CRCPA") Fla. *Stat.* § 772.101, *et seq,* and the Florida Racketeering Influenced and Corrupt Organizations Act (the "Florida RICO statute"), Chapter 895 of the Florida Statutes. Florida RICO was originally codified as a single act providing both civil and criminal remedies. In 1986, Florida RICO civil damages provisions were amended and transferred to another portion of the Florida Code by the Civil Remedies for Criminal Practices Act ("CRCPA"). Florida RICO, less its civil damages remedies, remains a part of the criminal code. As a result, two similar, but not identical, RICO-based statutes co-exist under Florida law. In broad terms, criminal actions, damages actions by the state and *actions for equitable relief, whether by the state*

*or private parties,* fall under Florida RICO, while private civil damages actions fall under

CRCPA. The Florida CRCPA provides for civil remedies. Plaintiff SMART SCIENCE

asserts that the forgoing described conduct also constitutes "criminal activity" under

Florida law *(Fla. Stat. § 772.101(1))*; that Defendant PMSI-NATIONWIDE, violated

both Florida RICO and CRCPA which incorporate any conduct defined as "racketeering

activity" under the Federal RICO law, 18 U.S.C. § 1961(1), as predicate acts; that the acts

were done with "intent" to violate the Florida RICO and CRCPA three substantive

violations and one conspiracy violation. *Fla. Stat. §§ 772.103(1) (CRCPA), 895.03(1)

(Florida RICO), Fla. Stat. §§ 772.103(2) (CRCPA), 895.03(2) (Florida RICO). Fla. Stat.

§§ 772.103(3) (CRCPA), 895.03(3) (Florida RICO), Fla. Stat. § 895.03(1)-(4).* Further,

the prohibited "pattern of racketeering activity" consisted of engaging in at least two

incidents of racketeering conduct that have the same or similar intents, results,

accomplices, victims, or methods of commission or that otherwise are interrelated by

distinguishing characteristics and are not isolated incidents, and at least one of such

incidents occurred after the effective date of this Act and that the last of such incidents

occurred within 5 years after a prior incident of criminal activity or racketeering conduct.

*Fla. Stat. §§ 772.102(4) and 895.02(4).*

68.     Defendant PMSI-NATIONWIDE, constitutes an "enterprise" under *Fla.

Stat. §§ 772.103(3) and 895.03(3).* Illicit proceeds of the enterprise were invested in real

property and the enterprise. *Fla. Stat. §§ 772.103(1) and (2) and 895.03(1) & (2).* 68. The

foregoing conduct constitutes a violation of Section 772.103(3), Florida Statutes, which

makes it unlawful for any person "employed by, or associated with, any enterprise to

conduct or participate, directly or indirectly, in such enterprise through a pattern of

criminal activity." Defendant PMSI-NATIONWIDE, and its agents, associates and

representatives, have conducted, and have conspired to conduct, the affairs of Defendant PMSI-NATIONWIDE, through a pattern of criminal activity in violation of §772.103(3). Specifically, Defendant PMSI-NATIONWIDE, is engaged in the widespread criminal practice of procuring consumer products from manufacturers (such as Plaintiff) at substantial discounts as part of a "sample sale" promotion after giving false assurances that such products will not be resold to retailers. Upon obtaining such products under false and fraudulent pretenses, Defendant PMSI-NATIONWIDE, illegally sells these products to wholesalers and other product diverters who then resell the diverted products at prices that greatly undercut the manufacturer's normal wholesale selling price to the retail trade that is normally serviced by such manufacturers. By clear and convincing evidence, Plaintiff SMART SCIENCE has shown that, as a direct and proximate result of the above described acts and violations of §§ 772.103 and 895.03, Plaintiff SMART SCIENCE has suffered actual damages and injury to its business and property in excess of $25,000,000 in direct loss of sales, as well as substantial consequential damages, lost sales and lost profits. Defendants are liable to Plaintiff SMART SCIENCE for treble damages, together with all costs of this action plus reasonable attorneys' fees, and equitable relief, all as provided under Chapter 772.104 and 895, Florida Statutes.

WHEREFORE, Plaintiff SMART SCIENCE demands judgment against Defendants for damages, costs of this action, attorneys' fees, and any other relief this Honorable Court deems just and proper.

## JURY TRIAL DEMANDED

69.     Plaintiff SMART SCIENCE hereby requests a jury trial on all claims triable.

Respectfully Submitted,

JOSEPH J. WEISSMAN, FBN 0041424
JOHNSON, POPE, BOKOR, RUPPEL
   & BURNS, LLP
403 E. Madison Street, Suite 400
Tampa, FL  33602
E-Mail:  josephw@jpfirm.com
Phone:  (813) 225-2500
Facsimile:  (813) 223-7118

And

STEPHEN A. WEITZMAN, ESQUIRE
4950 Reedy Brook Lane
Columbia, MD 21044
Phone: 301-596-5564
Facsimile: 410-740-1388
D.C. Bar No. 15602

Counsel for Plaintiff
SMART SCIENCE LABORATORIES, INC.

112593